UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DIANNE LEPAGE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 12-10299-JLT |
| E-ONE, INC., f/k/a EMERGENCY-ONE, | * | |
| INC. & GREENWOOD EMERGENCY | * | |
| VEHICLES, INC., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM

March 12, 2014

TAURO, J.

I.      Introduction

        This is a diversity suit governed by the substantive law of Rhode Island. Plaintiff Dianne

LePage raises claims sounding in tort and breach of warranty against Defendants E-One, Inc.

("E-One") and Greenwood Emergency Vehicles, Inc. ("Greenwood"). Presently before this court

are E-One's Motion for Summary Judgment [#111] and Greenwood's Motion for Summary

Judgment [#113]. For the reasons set forth below, E-One's Motion [#111] is DENIED and

Greenwood's Motion [#113] is ALLOWED IN PART and DENIED IN PART.[1]

_____

[1] For reasons discussed below, this court also grants summary judgment in favor of E-One on
Counts 1 and 3.

II.     Background

   A.     Facts[2]

   This action stems from an unfortunate accident involving the use of a fire truck with an

aerial platform ladder on June 29, 2009, which ultimately resulted in the death of Plaintiff's

husband, Allan LePage ("LePage"). The facts underlying this case are largely undisputed. There

are, however, several disputes as to key facts.

   1.     Background on the Fire Truck Involved in the Accident

   On or around December 21, 2000, the Kingston Fire District of Rhode Island purchased

the subject fire truck from Greenwood.[3] The truck was designed and manufactured by E-One and

was the same truck used by LePage when he suffered his fatal injury.[4] Greenwood was an

authorized dealer of E-One products.[5] The Kingston Fire District purchased the truck as a

"demo" truck,[6] and the truck was used at the time of purchase, having incurred 20,445 miles of

use.[7] Warranty repair work orders held by E-One contain a number of entries regarding the aerial

ladder controls not functioning properly, not responding, or needing adjustments.[8] E-One did not

inform Greenwood, the Kingston Fire District, or LePage of the warranty repairs or the issues

---

[2] Because this court is considering a motion for summary judgment, it sets forth the facts in the light most favorable to Plaintiff, as supported by the record. See De La Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).

[3] Pl.'s Additional Concise Statement Material Facts [hereinafter Pl.'s Facts] [#115-1] ¶ 1.

[4] Pl.'s Facts ¶ 1.

[5] Pl.'s Facts ¶ 1.

[6] Pl.'s Facts ¶ 2.

[7] Pl.'s Facts ¶ 2.

[8] Pl.'s Facts ¶ 3.

regarding the ladder controls prior to the truck's sale.[9] Although Plaintiff highlights these warranty repair work orders, she does not suggest that the controls malfunctioned at the time of the accident.

The controls for the aerial platform are designed in such a way that there is an adjustable, built-in delay between an operator releasing the control mechanism and the aerial platform actually coming to a stop.[10] The truck has two sets of controls for the aerial platform and ladder: one set on the aerial platform and one set lower on the truck. The controls present on the aerial platform allow an operator to stand on the platform and raise himself into the air and maneuver about. The built-in delay present in the controls means that once an operator using the controls on the platform releases them, the platform will continue moving in the direction it was traveling for approximately one second, rather than coming to an immediate stop.

### 2.    The Accident and Its Cause

The accident giving rise to this action occurred on June 29, 2009 at the Kingston fire station in Kingston, Rhode Island. Because LePage was alone at the time of the accident, the exact details as to how the accident occurred and what LePage was trying to accomplish are uncertain. Nevertheless, it is generally accepted that prior to the accident, LePage was attempting to open a scuttle door in the ceiling of the fire station with a twelve-foot pike pole.[11] The pole

---

[9] Pl.'s Facts ¶ 4.

[10] Pl.'s Facts ¶ 5. Defendants do not contest that there was an inherent delay in the controls and E-One admits that it designed the controls with the delay. See Def.'s Reply Mem. [#117], at 2 & n.1. The Parties agree that there is a disputed issue of material fact with respect to whether the controls were defectively designed.

[11] E-One's Concise Statement Material Facts [hereinafter E-One's Facts] [#111-2] ¶ 3; Greenwood's Concise Statement Material Facts [hereinafter Greenwood's Facts] [#114-1] ¶ 14; Pl.'s Opp'n E-One's Mot. Summ. J. [#115], at 3.

became stuck in the ceiling of the station and it is accepted that the events of the accident unfolded when LePage decided to use the aerial platform to remove the pole.[12]

At approximately 2:30 p.m. on June 29, a nearby surveillance camera recorded LePage entering the fire truck at the front of the fire station and driving it to the rear of the station.[13] LePage was then observed positioning the truck at an angle facing the north bay door of the station, which was open. LePage then parked the truck and began setting it up for operation.[14] LePage was next observed operating the aerial platform from the set of controls on the platform itself.[15] Surveillance footage showed LePage extending the ladder and platform into the open bay door and then elevating the platform out of the bed of the truck.[16] Finally, the aerial platform is observed coming to an abrupt stop and no further movement is seen until a second firefighter arrived in the bay.[17] Less than one minute after the platform came to a halt, firefighter Robert Hutchinson entered the fire station and observed the aerial platform extended through the open bay door and LePage with his head pinned between the guardrail of the platform and the header of the bay door.[18] Hutchinson used the lower set of controls to unpin LePage and called emergency responders. LePage was then transported to the hospital. It is undisputed that at the time of the accident LePage was not wearing a safety helmet and was operating the aerial platform by himself. LePage suffered a fatal head injury and passed away on June 30, 2009.

---

[12] Greenwood's Facts ¶ 16.

[13] Greenwood's Facts ¶ 17.

[14] Greenwood's Facts ¶ 18.

[15] E-One's Facts ¶ 8.

[16] E-One's Facts ¶ 10.

[17] E-One's Facts ¶ 11.

[18] E-One's Facts ¶ 12.

The Parties dispute what caused the accident. Defendants rely on several post-accident investigations, which essentially attribute the accident to user error. One investigation, conducted by the Public Safety Training Associates ("PSTA"), concluded that the direct cause of LePage's death was blunt force trauma to the head, with the indirect cause being human error.[19] The specific human error the PSTA identified was LePage's operation of the aerial platform in extremely close proximity to the fire station with insufficient overhead clearance.[20] The PSTA report also stated that there was no mechanical malfunction identified in the truck or aerial platform after the accident and that a mechanical malfunction did not cause the accident.[21] The findings of the PSTA were subsequently adopted by the Kingston Fire District.[22]

The National Institute for Occupational Safety and Health ("NIOSH") also investigated the accident. NIOSH prepared a report, which analyzed contributing factors that led to LePage's death.[23] That report identifies the following factors as contributing to the accident: (1) use of the aerial platform for a task more appropriately completed with a ground ladder; (2) working alone; (3) failure to don protective headgear; and (4) potentially diminished vision resulting from recent eye surgery.[24] It is undisputed that two weeks before the accident LePage had surgery to remove a cataract from one of his eyes and had scheduled surgery to remove a cataract from his other

---

[19] E-One's Facts ¶ 84.

[20] E-One's Facts ¶ 85.

[21] Greenwood's Facts ¶ 104.

[22] E-One's Facts ¶ 86.

[23] Greenwood's Facts ¶¶ 100–01.

[24] Greenwood's Facts ¶ 102.

eye.[25] LePage did not provide any documentation to the fire chief indicating he was medically cleared to return to work and perform his duties.[26] It unclear what, if any, effect the recent surgery and remaining cataract had on LePage's vision.

Plaintiff, on the other hand, maintains that the accident was caused by a design defect in the controls. Plaintiff has retained three expert witnesses who identify alleged defects which either caused or contributed to the accident.[27] Plaintiff essentially identifies two types of defects. First, one of Plaintiff's experts maintains that the platform's controls were laid out in a confusing manner, making it likely that LePage selected the wrong lever and moved in a direction that he did not anticipate.[28] Second, Plaintiff's experts identify the built-in delay of the platform controls as being causally linked to LePage's death. Engineer Robert Howard explains that the built-in delay could cause the platform to continue moving beyond the point at which the operator intended to stop and cause personal injury.[29] The PSTA post-accident investigation also documented a one-second delay in the controls and its report stated that "this fact is crucial to the operation of the subject aerial device in the close quarters of the Kingston fire station on the day of the event."[30]

---

[25] Greenwood's Facts ¶ 108.

[26] Greenwood's Facts ¶ 109.

[27] Greenwood's Facts ¶ 111.

[28] Pl.'s Opp'n E-One's Mot. Summ. J. [#115] Ex. J [hereinafter Holt Report].

[29] Pl.'s Opp'n E-One's Mot. Summ. J. [#115] Ex. K [hereinafter Howard Report].

[30] Pl.'s Facts ¶ 13; Pl.'s Opp'n E-One's Mot. Summ. J. [#115] Ex. I, at 11.

3.    Maintenance of the Fire Truck

At the time of the accident, LePage had been a volunteer with the Kingston Fire District for more than forty-two years,[31] and then held the position of maintenance coordinator.[32] This position made LePage responsible for coordinating maintenance for the fire station and its equipment, including the fire truck and aerial platform.[33] Moreover, if any person at the fire department observed that the fire truck was in need of repairs, they were to bring the matter to LePage's attention.[34]

According to Nathan Barrington, the Fire Chief at the time of the accident, no member of the fire department had ever communicated to him that there was a condition that would make the truck unsafe.[35] On June 15, 2009, two weeks prior to the accident, the truck passed its yearly inspection and performance test as recommended by the National Fire Protection Association ("NFPA") 1911 Standard for the Inspection, Maintenance, Testing, and Retirement of In-Service Automotive Fire Apparatus.[36] These guidelines serve as the national inspection standard.[37] This inspection did not document any delay in the aerial platform controls.[38] Chief Barrington states that at the time of the incident, the fire truck was functioning normally.[39] Investigations

---

[31] Greenwood's Facts ¶ 8.

[32] Greenwood's Facts ¶ 28.

[33] Greenwood's Facts ¶¶ 28–29.

[34] Greenwood's Facts ¶ 31.

[35] Greenwood's Facts ¶ 32.

[36] Greenwood's Facts ¶ 33.

[37] Greenwood's Facts ¶ 34.

[38] Pl.'s Facts ¶ 10.

[39] Greenwood's Facts ¶ 36.

conducted following the incident revealed no defects or mechanical malfunctions in the truck that caused the accident.[40] Finally, the Kingston Fire District has continued to routinely use the fire truck since the accident occurred.[41]

        4.      LePage's Experience and Training

As mentioned above, LePage had been a volunteer firefighter for forty-two years at the time of the accident. During his forty-two-year career, LePage held every position other than fire chief[42] and operated aerial devices of one sort or another virtually the entire time.[43] As part of his general training, LePage completed a 600-hour program required to operate any fire department apparatus.[44] This program included training on aerial ladders.[45] After he completed this training program, LePage was authorized to train new firefighters to operate platform aerial ladders.[46] LePage was a Certified Fire Instructor pursuant to NFPA 1041,[47] which is a methodology program on how to teach a training course to other members.[48]

All Parties agree that LePage also had extensive training and knowledge with regard to the specific fire truck and aerial platform involved in the accident. A fellow firefighter referred to

---

[40] Greenwood's Facts ¶¶ 38–39.

[41] E-One's Facts ¶ 64.

[42] Greenwood's Facts ¶ 44.

[43] Greenwood's Facts ¶ 40.

[44] Greenwood's Facts ¶ 41.

[45] Greenwood's Facts ¶ 41.

[46] Greenwood's Facts ¶ 42.

[47] Greenwood's Facts ¶ 45.

[48] Greenwood's Facts ¶ 47.

the fire truck as LePage's "baby,"[49] and Chief Barrington agreed that LePage's familiarity with the fire truck was "nearly legendary among members of the department."[50] Of all the members in the department, LePage had the most experience using the truck and aerial platform.[51] After the truck was delivered to the fire department, LePage and other firefighters attended and completed a four-day training program on the truck.[52] This training program incorporated the Operator's Manual provided by E-One[53] and was conducted by Joseph Cordeiro, a Greenwood employee.[54]

Cordeiro instructed LePage and the other attendees how to position and stabilize the apparatus, as well as how to position firefighters while using the apparatus.[55] Cordeiro further instructed the attendees that a second firefighter should be present at the truck's lower controls if anyone was operating the aerial platform.[56] Cordeiro also provided hands-on training on the proper operation of the platform's controls.[57] Attendees were instructed that they should not operate the aerial platform near obstructions, should not use the platform for non-firefighting tasks, and should always wear helmets while operating the platform.[58] Cordeiro informed LePage

---

[49] Dep. Robert C. Hutchinson [#114-21], at 25–26.

[50] Dep. Nathan Barrington [#114-5], at 121 (affirming a statement contained in the PSTA post-accident report).

[51] E-One's Facts ¶ 69.

[52] Greenwood's Facts ¶ 51.

[53] Greenwood's Facts ¶ 51.

[54] Greenwood's Facts ¶ 52.

[55] Greenwood's Facts ¶ 53.

[56] Greenwood's Facts ¶ 54.

[57] Greenwood's Facts ¶ 55.

[58] Greenwood's Facts ¶ 56.

and the other attendees that they should become familiar enough with the platform's controls that they could operate the platform without looking at them.[59] Other elements of the training included driving up to a building, identifying hazards, and identifying the proper position at which to place the aerial platform.[60] During the training program, Cordeiro instructed the attendees that the primary danger in operating the platform near a building was striking it.[61] Finally, the training included a classroom component in which Cordeiro thoroughly went over the Operator's Manual.[62]

After LePage became authorized to operate the aerial platform, he was tasked with training other members of the fire department how to use the apparatus. And from the time the fire department purchased the truck until his accident, LePage was also assigned the duty of determining whether or not an individual was authorized to operate the aerial platform safely.[63] On at least one other occasion, LePage provided training to another fire station regarding the operation of a fire truck similar to the one involved in the accident.[64] LePage and another firefighter, Anthony Vitone, drafted operational procedures regarding operation of the ladder truck.[65] In addition to training other firefighters on how to drive the truck and set up the aerial lift for operation, LePage also specifically trained members on the use of the platform in confined

---

[59] Greenwood's Facts ¶ 58.

[60] Greenwood's Facts ¶ 59.

[61] Greenwood's Facts ¶ 60.

[62] Greenwood's Facts ¶ 57.

[63] Greenwood's Facts ¶¶ 65, 67–68.

[64] Greenwood's Facts ¶ 64.

[65] Greenwood's Facts ¶ 69.

spaces.[66] LePage was adamant that other firefighters not be allowed to operate the truck until he was sure they knew everything about its operation.[67]

     5.    <u>Instructions and Warnings</u>

As discussed above, the truck's Operator's Manual was incorporated into the four-day training provided by Cordeiro, and LePage would have been familiar with the manual in order to be authorized to operate the truck. The manual was also incorporated into the training of new users after the purchase of the truck.[68] This manual contained safety precautions, warnings, and prohibitions related to the operation of the truck and aerial platform. Similar warnings are adhered to the truck and platform as well. Among the safety precautions contained in the manual are the following: (1) users should not use the aerial platform as a crane or leverage device; (2) users should ensure the area in the direction of movement is clear of obstructions and personnel before initiating platform movement; (3) users should keep their eyes on the assembly to avoid overhead electrical wires or other objects that could be struck; and (4) users should account for electrical power lines within ten feet of the platform or other obstructions.[69] The manual further informs readers that anyone departing from its instructions may jeopardize their personal safety or the safety of others.[70] The manual also instructs users to operate the controls smoothly in order

---

[66] Greenwood's Facts ¶¶ 70–72.

[67] Greenwood's Facts ¶ 73.

[68] Greenwood's Facts ¶ 77.

[69] Greenwood's Facts ¶ 78.

[70] Greenwood's Facts ¶ 79.

to prevent jerking and erratic aerial movement, with whipping and bouncing being the most likely cause of damage to the assembly.[71]

In addition to the above warnings, the manual also contains several alerts in all capital letters regarding the dangers posed by power lines and other electrical currents. These warnings state that the platform is not insulated and users therefore need to account for such hazards and ensure adequate clearance.[72] The aerial platform itself bears a similar warning regarding the dangers of electrical currents and states that users must allow for sway, rock, or sag when determining adequate clearance from power lines.[73]

The Operator's Manual also states, however, that "the vehicle is designed for maximum stability and maneuverability under all operating conditions" and that it "is designed for easy operation."[74] And, despite the numerous warnings and safety precautions the Operator's Manual contains, it is undisputed that it does not inform users of the adjustable delay in the platform's controls.[75] Although the Operator's Manual warned of the dangers posed by operating the aerial platform near power lines and other obstructions, it also contemplated that such use would occur by providing instructions to be followed "when maneuvering the aerial [platform] near buildings or confined spaces."[76]

---

[71] Greenwood's Facts ¶ 80.

[72] Greenwood's Facts ¶ 82.

[73] Greenwood's Facts ¶ 83.

[74] Pl.'s Opp'n E-One's Mot. Summ. J. [#115] Ex. F [hereinafter Operator's Manual], at 00720.

[75] Pl.'s Facts ¶ 9.

[76] Operator's Manual at 00703, 00760.

6.      Other Firefighters' Familiarity with the Truck

Several members of the fire department provided deposition testimony regarding their use of and experiences with the fire truck and aerial platform involved in LePage's accident. At the time of the accident, William Foley had been a volunteer firefighter with several departments since 1975 and was then a member of the Kingston fire department.[77] Foley stated that he did not like the controls of the aerial platform because it was difficult to anticipate exactly when the platform would stop moving.[78] He also stated that the Kingston firefighters referred to the process of bringing the platform to a stop as "feathering it."[79]

Firefighter Taylor Kirschener is currently a member of the New York Fire Department and has been a member of a ladder company in Brooklyn since 2008.[80] Kirschener has also served as a volunteer firefighter with the Kingston Fire District since 2004.[81] As a member, Kirschener was trained and authorized to use the fire truck and aerial platform and had served as a lieutenant on the truck.[82] Kirschener testified that the "general attitude" among the firefighters at the station was that the truck and platform involved in LePage's accident were not well liked.[83] He stated that the "electronic and hydraulic controls were very finicky."[84] At the hearing on the motions for summary judgment, this court asked whether there was deposition testimony

---

[77] Pl.'s Facts ¶ 17.

[78] Dep. William Foley, Sr. [#114-23], at 33–34.

[79] Dep. William Foley, Sr. [#114-23], at 34.

[80] Pl.'s Facts ¶ 26.

[81] Pl.'s Facts ¶ 27.

[82] Pl.'s Facts ¶¶ 28–29.

[83] Pl.'s Facts ¶ 30.

[84] Dep. Taylor Kirschener [#114-24], at 22–23.

from the firefighters saying that they knew about the delay. Plaintiff and E-One explained that

the firefighters did not testify that they knew about the continued movement, but rather that some

users found the controls to be jerky. This testimony apparently related to the user's skill in

operating the device.

>   7.   Fire Station Policies and Use of the Truck Inside the Station

The Parties dispute whether LePage's use of the aerial platform in the confines of the fire

station violated any fire department policies. Chief Barrington testified that there was no rational

or logical reason that anyone would operate the platform in the manner LePage had during the

accident and that it was a violation of standard safety practices.[85] Chief Barrington also stated

that he considered LePage's conduct to be a gross safety violation and that he would have fired

LePage if he had not died in the accident.[86] He agreed that the "Standard Operation Guidelines"

and training documents for the truck that the Kingston Fire District had in effect at the time of

the accident stated that while aerial devices are often used for search, rescue, ventilation, and

roof access during a fire, they should not be viewed as replacements for ground ladders.[87] Chief

Barrington stated that none of LePage's official duties required him to insert the aerial platform

inside the fire station bay.[88]

Chief Barrington also stated, however, that he was not cleared or certified to operate the

aerial platform.[89] He further conceded that LePage's actions did not violate any written rule,

---

[85] E-One's Facts ¶ 110.

[86] E-One's Facts ¶¶ 111–12.

[87] Greenwood's Facts ¶ 93; Dep. Nathan Barrington [#114-4], at 85–87.

[88] Greenwood's Facts ¶ 96.

[89] Pl.'s Facts ¶ 36.

regulation, or condition of employment.[90] Additionally, while Chief Barrington stated that he

was not aware of anyone having previously inserted the aerial platform into the station as LePage

did during the accident,[91] the testimony of other firefighters indicates that it was relatively

commonplace. First, Foley testified that he had seen the aerial ladder extended through the bay

doors prior to LePage's accident and had thought nothing of it.[92] Firefighter Anthony Vitone also

testified that he had seen the truck parked outside the station with the ladder extended through

the bay doors prior to LePage's death.[93] Vitone further stated that he and others had used the

truck and aerial platform in a similar manner and identified eight other firefighters who had done

so.[94] According to Vitone, Chief Barrington *had* witnessed the aerial platform being used inside

the fire station in the past and that there were no policies against doing so. In any event, Vitone

testified that no one who used the platform inside the station was ever reprimanded.[95] Finally,

Vitone stated that he had seen the truck used for maintenance purposes in the past and that he did

not perceive there to be excessive risk in doing so.[96] Kirschener made similar observations

regarding the use of the truck for maintenance purposes and further stated that it had been used

to hang Christmas lights at other stations and to paint a flag pole at the University of Rhode

---

[90] Pl.'s Facts ¶ 36.

[91] Dep. Nathan Barrington [#114-5], at 188–89.

[92] Pl.'s Facts ¶ 18.

[93] Pl.'s Facts ¶ 21.

[94] Pl.'s Facts ¶¶ 22–23.

[95] Pl.'s Facts ¶ 24.

[96] Pl.'s Facts ¶ 25.

Island.[97] According to Kirschener, it was also common training practice for the aerial platform to be inserted through the garage bay door from the outside.[98]

      B.    <u>Procedural History</u>

      Plaintiff filed her <u>Complaint</u> [#1] and initiated suit on February 25, 2012. Greenwood filed a Rule 12(b)(6) motion on April 4, 2012. Plaintiff filed her <u>First Amended Complaint</u> [#11] on April 6, 2012. Greenwood then filed another 12(b)(6) motion to dismiss Plaintiff's first amended complaint on April 19, 2012. On April 25, 2012, E-One filed answers to both of Plaintiff's complaints. Following a hearing on June 6, 2012, this court denied Greenwood's first motion to dismiss as moot in light of the first amended complaint. This court also denied Greenwood's motion to dismiss the first amended complaint without prejudice in order to give Plaintiff an opportunity to state claims under Rhode Island law. This court further authorized the Parties to take certain depositions, which were to be completed by January 31, 2013.

      On June 18, 2012, Plaintiff filed a motion to further amend her complaint, which this court allowed. E-One filed an answer to Plaintiff's second amended complaint on July 30, 2012. On July 31, 2012, Plaintiff filed an emergency motion to prevent the spoliation of evidence relevant to this case, which this court allowed. Certain repairs on the truck and platform involved in the incident were scheduled to take place before Plaintiff's expert would have an opportunity to inspect the apparatus. This court enjoined Greenwood and the Kingston Fire District from performing any repairs until Plaintiff's metallurgist examined the truck on August 1, 2012.

      On August 6, 2012, Greenwood filed an answer to Plaintiff's second amended complaint and asserted cross claims against E-One. E-One filed its answer to Greenwood's cross claims on

---

[97] Pl.'s Facts ¶¶ 32–33.

[98] Pl.'s Facts ¶ 34.

August 17, 2012. On December 5, 2012, non-parties Kingston Fire District, PSTA, and Forster Associates filed an emergency motion to quash or modify subpoenas of non-party witnesses and sought a protective order to prevent disclosure of documents they considered to be work product. On December 7, 2012, Plaintiff filed a motion to compel the Kingston Fire District to allow her experts to conduct testing on the fire truck and bay door header involved in LePage's accident. This court held a hearing on December 17, 2012 to address the then-pending discovery issues. The Parties were ordered to file a joint protective order resolving the discovery issues based upon an agreement reached in court. On January 2, 2013, the Parties filed their joint motion for a protective order, which this court allowed. This court entered a further order on January 17, 2013 resolving additional outstanding discovery issues.

Between March and July 2013, the Parties continued discovery and received several extensions of time to make expert disclosures. In late August, the Parties consented to participation in the court's mediation program. E-One filed its motion for summary judgment on October 25, 2013, and Greenwood followed suit on October 29. Additional briefing followed and this court held a hearing on the motions for summary judgment on March 6, 2014. The motions are now ripe for disposition.

III.   Discussion

Plaintiff brings this suit in both her individual capacity and her capacity as the executrix of LePage's estate. Plaintiff's second amended complaint contains fourteen counts. She raises seven nearly identical claims against both Greenwood and E-One, including: (1) breach of express warranty; (2) breach of the implied warranty of merchantability; (3) breach of the implied warranty of fitness for a particular purpose; (4) negligence for failure to warn about the

platform's controls; (5) negligent design or maintenance of the platform controls; (6) violation of the Rhode Island wrongful death statute; and (7) loss of consortium.

E-One and Greenwood both argue that summary judgment is warranted in this case because LePage voluntarily assumed the risk of any danger Defendants may have created. Plaintiff argues that there are factual disputes precluding the entry of summary judgment on the basis of assumption of the risk. In the alternative, Greenwood also argues that it is entitled to summary judgment on all counts against it because Plaintiff is unable to prove essential elements of every claim raised.

A.    Summary Judgment Standard

A court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[99] The court views the record in the light most favorable to the nonmoving party and resolves all reasonable inferences in its favor.[100] A genuine factual issue exists if the issue "may reasonably be resolved in favor of either party."[101] A fact is considered material if it "possess[es] the capacity to sway the outcome of the litigation under the applicable law."[102] After the movant has satisfied its burden to establish the absence of any genuine issues of material fact, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."[103]

---

[99] Fed. R. Civ. P. 56(a).

[100] Clifford v. Barnhart, 448 F.3d 276, 280 (1st Cir. 2006).

[101] DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005).

[102] Id.

[103] Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999).

Summary judgment is appropriate if the nonmovant "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."[104] Moreover, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient and "there must be evidence on which the jury could reasonably find for the" nonmovant.[105]   If the parties "tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[106]

B.      Whether Defendants Are Entitled to Summary Judgment on the Basis of Assumption of the Risk

Defendants' primary ground for entry of summary judgment in their favor is that LePage voluntarily assumed the risk of operating the aerial platform in the manner that he did. Assumption of the risk is an affirmative defense that, if proven, absolves the defendant of all liability for wrongdoing.[107] In Rhode Island, assumption of the risk is a defense to products liability actions. The doctrine is "a potential defense in all negligence actions."[108] The doctrine is also available in breach of warranty actions.[109] Defendants concede that there are factual disputes

---

[104] Smith v. Stratus Computer, Inc., 40 F.3d 11, 13 (1st Cir. 1994).

[105] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

[106] Scott v. Harris, 550 U.S. 372, 380 (2007).

[107] Raimbeault v. Takeuchi Mfg. (U.S.) Ltd., 772 A.2d 1056, 1064 (R.I. 2001).

[108] Kennedy v. Providence Hockey Club, Inc., 376 A.2d 329, 332 (R.I. 1977).

[109] See Fiske v. MacGregor, 464 A.2d 719, 729 (R.I. 1983) (strongly suggesting, though not stating outright, that assumption of the risk is a valid defense to product liability claims based in breach of warranty); see also Sheehan v. N. Am. Mktg. Corp., 610 F.3d 144 (1st Cir. 2010) (applying the assumption-of-the-risk doctrine to products liability claims grounded in breach of warranty).

about whether the controls were defective. Nonetheless, a court may resolve a motion for summary judgment on assumption-of-the-risk grounds without determining whether the plaintiff has satisfied the elements of each of her claims.[110]

A plaintiff will be found to have assumed the risk of injury if he "knowingly accepts a dangerous situation."[111] In order for a plaintiff to assume a risk, he "must know of the existence of the risk and appreciate its unreasonable character."[112] Additionally, the plaintiff must voluntarily expose himself to the risk.[113] Determining whether a plaintiff assumed the risk of injury entails a subjective inquiry into whether the plaintiff both knew of the risk and appreciated its dangerousness at the time of the incident. The court will thus examine "what the particular individual in fact saw, knew, understood, and appreciated."[114]

Because the assumption-of-the-risk determination is a subjective factual inquiry, it is typically a question to be submitted to the jury.[115] If the record suggests that "only one rational inference can be drawn from the evidence," however, a court may treat the issue as a matter of law.[116] Rhode Island courts have resolved assumption of the risk as a matter of law on numerous occasions.

---

[110] See Sheehan, 610 F.3d at 151 (affirming entry of summary judgment on assumption-of-the-risk grounds without deciding whether the plaintiff could prove proximate causation); Filosa v. Courtois Sand & Gravel Co., 590 A.2d 100, 103 (R.I. 1991).

[111] Kennedy, 376 A.2d at 333.

[112] Raimbeault, 772 A.2d at 1064.

[113] Martins v. Omega Elec. Co., 692 A.2d 1203, 1205 (R.I. 1997).

[114] D'Allesandro v. Tarro, 842 A.2d 1063, 1067 (R.I. 2004).

[115] Id.

[116] Id.; see also Raimbeault, 772 A.2d at 1064; Filosa, 50 A.2d at 104; Drew v. Wall, 495 A.2d 229, 232 (R.I. 1985); Rickey v. Boden, 421 A.2d 539, 544 (R.I. 1980).

Considering the entire factual record and viewing it in the light most favorable to Plaintiff, this court concludes that there are disputes of material fact precluding the entry of summary judgment on the basis of assumption of the risk. In order for this court to grant summary judgment to Defendants on the basis of assumption of the risk, it must conclude that the only rational inference a jury could draw from the evidence is that LePage subjectively knew about the continued movement of the platform, appreciated the danger posed by operating the platform in the confines of the fire station, and voluntarily chose to expose himself to the risk.

Plaintiff points out that in this case, there is no direct testimony from LePage as to whether he knew about the delay in the controls. Defendants rightly argue, however, that direct testimony from the victim is unnecessary and that in at least one instance, a Rhode Island court has granted a directed verdict on assumption-of-the-risk grounds based on strong circumstantial evidence.[117] In Drew v. Wall, the Supreme Court of Rhode Island considered whether an experienced shipyard worker assumed the risk of asphyxiation when he entered a sewer pit while a gasoline-powered motor was running. Based on the fact that the decedent had extensive experience in the shipyard and had previously become dizzy upon entering a pit while an engine was running, the court found that it "must necessarily infer that a man with [the decedent's] background and experience in the shipyard knew the hazard of entering the pit with the engine operating."[118]

Here, Defendants argue that although there is no direct testimony from LePage regarding his knowledge of the delay, the record is rife with circumstantial evidence supporting the inference that he knew of the delay. Defendants rely on the following facts: (1) LePage had

_____

[117] See Drew, 495 A.2d 229.

[118] Drew, 495 A.2d at 232.

extensive experience using firefighting equipment in general and the truck involved in the accident in particular; (2) LePage attended a four-day training course at which the dangers of operating the platform in close proximity to building were covered; (3) LePage was familiar with the contents of the Operator's Manual and the warnings contained therein; (4) LePage was the most experienced member of the department on the use of the truck involved in the accident and was responsible for determining whether other members were qualified to use it; and (5) LePage and another member of the department drafted safety procedures for the use of the truck. Defendants argue that it is simply not possible that someone who had used the aerial platform as much as LePage would not know about the delay built into the controls and the danger posed by operating the platform inside a building.

Plaintiff counters that despite all the warnings contained in the Operator's Manual and on the truck itself, there is not a single warning anywhere regarding the delay. Moreover, the annual maintenance inspection conducted two weeks prior to the accident did not document the delay in the controls. Plaintiff also relies on the fact that none of the other firefighters testified they or LePage were specifically aware of the delay in the controls. At the hearing on the motions for summary judgment, this court questioned the Parties about the existence of direct evidence of LePage's knowledge (or lack thereof) with respect to the delay. E-One conceded that although there was testimony from the firefighters concerning whether the platform's controls were jerky or smooth, there was not testimony stating that they knew about the delay.

Plaintiff also relies on the fact that there are serious questions about the extent to which the firefighters perceived there to be any danger associated with operating the platform inside the station. Although the fire chief stated that operating the platform inside the station was a safety violation, the other firefighters stated that it occurred on a regular basis as part of training and for

maintenance. They further stated that they did not believe there to be any inherent risks in doing so. Ultimately, Plaintiff argues that there is no direct evidence of LePage's knowledge, circumstantial evidence pointing in both directions, and that the issue is more appropriate for a jury.

This court agrees with Plaintiff. On the record before it, this court cannot conclude that a rational jury would reach only one conclusion on the issues relevant to the assumption-of-the-risk defense. This case can be distinguished from <u>Drew</u>. In <u>Drew</u>, the court did not rely solely on the decedent's work history. Instead, the court also relied on evidence that the decedent had entered the pit and become dizzy before reentering the pit a second time and succumbing to asphyxiation. Here, there is no similar evidence that LePage had actually experienced the platform moving after releasing the controls on a prior occasion and appreciated the danger. Assumption of the risk is the only argument E-One raises in support of its motion for summary judgment. Accordingly, that motion is DENIED.

C.    The Breach of Warranty Claims

Greenwood marshals other arguments in favor of its motion for summary judgment. Plaintiff relies on numerous theories of liability in her second amended complaint. Among those theories are three claims for breach of various warranties. Greenwood argues that it is entitled to summary judgment on each of these warranty claims because Plaintiff has not produced evidence necessary to prove essential elements of each claim. As a general matter, this court notes that there are relatively few facts in the record concerning the sale of the truck.

1.    Express Warranty

Plaintiff claims that both Greenwood and E-One breached some sort of express warranty when they sold the fire department a truck with allegedly defective controls. Plaintiff argues that

the Operator's Manual expressly warranted that the aerial platform was "designed for maximum stability and maneuverability under all operating conditions and that the firefighting apparatus was comprised of easy to use component systems and is designed for easy operation." She claims that the Defendants breached this warranty by manufacturing and selling an aerial platform that her experts opine is inherently unsafe.

Greenwood argues that Plaintiff fails to provide evidence necessary to succeed on a claim for breach of express warranty. In order to establish that there was a breach of an express warranty, a plaintiff must prove that statements or representations made by the seller induced him to purchase the good and that he relied on those statements or representations.[119] And, as Greenwood points out, the record contains no evidence that any representations were made to anyone from the fire department prior to or during the sale, or that the fire department was induced to purchase the truck on the basis of those representations.

Plaintiff's opposition states that the language contained in the Operator's Manual was "inherently part of the sale" and that "Greenwood adopted the express warranties made within the manual when it provided the manual during the sale of the truck."[120] Plaintiff does not elaborate on these statements, either factually or legally. Nor does she explain what evidence in the record indicates that the fire department or LePage was aware of the statements in the manual and relied on them in purchasing the truck. Because Plaintiff fails to identify evidence supporting this claim, Greenwood is entitled to summary judgment on Count 8. Although only Greenwood moves for summary judgment on this ground, this court also grants summary judgment in favor

---

[119] Thomas v. Amway Corp., 488 A.2d 716, 720 (R.I. 1985) ("The plaintiff who claims breach of express warranty has the burden of proving that the statements or representations made by the seller induced her to purchase that product and that she relied upon such statements or representations.").

[120] Pl.'s Opp'n Def. Greenwood's Mot. Summ. J. [#116], at 7–8.

of E-One on Count 1 because there is a complete failure of proof, regardless of which Defendant

the claim is asserted against.[121]

### 2.   Implied Warranty of Fitness for a Particular Purpose

Plaintiff also asserts that both Defendants breached an implied warranty of fitness for a

particular purpose. In order to prove that a seller created and breached an implied warranty of

fitness for a particular purpose, a plaintiff must prove that (1) the seller knew or had reason to

know of a *particular* purpose the buyer had in mind and (2) the buyer relied on the seller's skill

or judgment to select the appropriate product for the task.[122] Greenwood argues that the record is

devoid of any evidence suggesting that it knew or had reason to know that the fire department or

anyone else had in mind a particular purpose for the aerial platform other than its ordinary

purpose. Similarly, it argues that there is no evidence that anyone relied on Greenwood's skill to

select the appropriate product.

Plaintiff's opposition does not point to any evidence that Greenwood had reason to know

of a particular purpose to which the truck would be put at the time of sale or that anyone relied

on Greenwood's skill or judgment to select the appropriate product. First, Plaintiff points to

statements in the Operator's Manual as evidence of a warranty. These statements say nothing

about whether Greenwood knew of a particular purpose to which the truck would be put. Second,

Plaintiff argues that "Greenwood was relied upon by the Kingston Fire Department to provide

---

[121] A district court may enter summary judgment in favor of a party even though no party asked for it if two conditions are present. Sanchez v. Triple-S Mgmt., Corp., 492 F.3d 1, 7 (1st Cir. 2007). Those conditions are: (1) discovery has advanced far enough to give the parties an opportunity to learn the material facts and (2) the targeted party must be given notice and a chance to present evidence on the essential elements of its claim. Id. Here, this court is not acting entirely sua sponte since one Defendant *did* move for summary judgment on the express warranty claim. Discovery in this case has been completed and Plaintiff had ample notice and opportunity to present her evidence in response to Greenwood's motion.

[122] Mktg. Design Source, Inc. v. Pranda N.A., Inc., 799 A.2d 267, 272 (R.I. 2002).

training on the aerial platform and to provide maintenance while the truck was being used."[123] But the fact that Greenwood provided general training as part of the sale and provided maintenance on the truck says nothing about whether the fire department relied on Greenwood to select the correct product to achieve any particular purpose it may have had in mind.

   As the foregoing discussion demonstrates, Plaintiff has failed to provide evidence necessary to establish essential elements of her claim for breach of the implied warranty of fitness for a particular purpose. Accordingly, Greenwood is entitled to summary judgment on Count 10. Once again, because there is a complete failure of proof, this court will also grant summary judgment to E-One on Count 3.

### 3.   Implied Warranty of Merchantability

   Plaintiff's final warranty theory is that Defendants breached the implied warranty of merchantability. If a seller is a merchant of a particular type of good, the merchant's sale of that type of good creates a warranty that the product sold is merchantable.[124] For a good to be merchantable, it must, among other things, be "fit for the ordinary purposes for which such goods are used."[125] Greenwood argues that it did not design or manufacture the truck or aerial platform at issue in this case. It further argues that Plaintiff has not "presented any facts from which a jury could reasonably infer that the platform aerial ladder was not fit for its ordinary purpose when used in its intended manner."[126] There is no further elaboration.

---

[123] Pl.'s Opp'n Def. Greenwood's Mot. Summ. J. [#116], at 6.

[124] R.I. Gen. Laws § 6A-2-314(1).

[125] Id. § 6A-2-314(2)(c); Lariviere v. Dayton Safety Ladder Co., 525 A.2d 892, 896 (R.I. 1987).

[126] Mem. Supp. Def. Greenwood's Mot. Summ J. [#114], at 19.

Plaintiff contends that her experts' opinions that the platform's controls were unreasonably dangerous create an issue of fact with respect to whether the platform was fit for its ordinary purposes. Plaintiff's second amended complaint asserts that the ordinary purposes of the aerial platform include raising and lowering the platform and firefighters within it in a safe manner. Without more developed argumentation on the part of Greenwood, summary judgment is improper. If Plaintiff is able to prove that the platform's controls were unreasonably dangerous, there would appear to be a question as to whether the platform was fit for raising and lowering its occupants in any of the situations in which the platform is ordinarily used. Greenwood's use of the phrase "when used in its intended manner" seems more relevant to whether LePage assumed the risk or was contributorily negligent than whether the platform was fit for its ordinary purposes. Accordingly, Greenwood is not entitled to summary judgment on Count 9.

D.     The Negligence Claims

Plaintiff also asserts two brands of negligence against Greenwood. Count 11 claims that Greenwood negligently failed to warn LePage about the dangers posed by the delay in the controls. Count 12 asserts a common-law negligence claim, apparently premised on defective design or maintenance of the truck. Greenwood raises a host of arguments that it is entitled to summary judgment on both of these claims.

Before addressing each claim, this court pauses to note a peculiarity. Plaintiff's second amended complaint clearly labels Counts 11 and 12 as negligence claims.[127] Moreover, Count 12 uses language typically associated with a negligence action.[128] The arguments presented in

---

[127] Similarly, Counts 4 and 5, which assert essentially identical claims against E-one, are also labeled as negligence claims.

[128] See 2d Am. Compl. [#64] ¶¶ 75–77.

Greenwood's motion for summary judgment are all premised on the assumption that Counts 11 and 12 contain negligence claims. Plaintiff's opposition largely fails to respond to Greenwood's arguments that Plaintiff cannot prove essential elements of her negligence claims. Instead, Plaintiff cites section 402A of the *Restatement (Second) of Torts* and argues that she has presented facts that Greenwood can be held liable as the seller of the aerial platform. Section 402A deals with strict products liability.

At the hearing on the motions for summary judgment, this court specifically asked the Parties to address the theories of liability on which Plaintiff was relying. Greenwood argued that the second amended complaint plainly asserts negligence claims and that there are no separate counts seeking to impose liability on a theory of strict liability. Plaintiff did not contest this characterization. Moreover, Plaintiff referred to her "negligence claims" several times over the course of the hearing. Accordingly, this court construes Plaintiff's second amended complaint as containing only negligence claims and no strict liability claims.

  1. <u>Failure to Warn</u>

Count 11 claims that Greenwood was negligent in failing to warn Plaintiff of the design defect in the aerial platform. "In negligence, the defendant only has a duty to warn if he had reason to know about the product's dangerous propensities which caused plaintiff's injuries."[129] A seller must exercise reasonable care to warn purchasers if it "knows or has reason to know that the chattel is, or is likely to be, dangerous when used."[130] Greenwood argues that Plaintiff has failed to introduce any evidence that Greenwood knew or had reason to know of any alleged

---

[129] <u>Raimbeault</u>, 772 A.2d at 1063–64.

[130] <u>Ritter v. Narragansett Elec. Co.</u>, 283 A.2d 255, 258 (R.I. 1971).

design defect in the aerial platform when it sold the truck to the fire department or that using the

platform would pose a danger. Greenwood notes that it did not design or manufacture the truck.

Plaintiff responds that Greenwood was a licensed dealer of E-One products and it

employed trained salesmen and mechanics who a jury could conclude knew or had reason to

know that the aerial platform is likely to be dangerous due to the unreasonably dangerous

controls. But Plaintiff points to no facts in the record that support the conclusion that Greenwood

or its employees had any reason to know that the platform's controls, which it did not design,

posed a danger to users. There is simply no indication that anyone at Greenwood had any reason

to believe that the aerial platform was not safe for use. Accordingly, summary judgment shall

enter in favor of Greenwood on Count 11.

### 2. Common-Law Negligence

Count 12 asserts that Greenwood negligently failed to provide proper maintenance on the

truck and platform after their sale, despite having a duty to do so. The count also seems to assert

that Greenwood was negligent in failing to inspect and remedy any defects in the platform's

controls. Greenwood argues that there is no evidence in the record that it was in any way

negligent in the performance of its maintenance. Instead, the evidence shows that Greenwood

has consistently provided maintenance and repair work on the truck as requested by the fire

department.

Greenwood further argues that Plaintiff has failed to provide necessary expert testimony.

In Rhode Island, expert testimony is *required* to establish any matter that is not obvious to a lay

person.[131] Expert testimony is thus required to establish a standard of care "'with respect to

---

[131] Mills v. State Sales, Inc., 824 A.2d 461, 468 (R.I. 2003).

inspection and testing and the defendant's deviation from that standard.'"[132] Greenwood

contends that the proper standard of care for conducting repair work on and maintaining

emergency vehicles like the one at issue here lies beyond common knowledge and must be

proven by expert testimony. And, it points out, Plaintiff's experts provide evidence only of the

platform's defective design, not the standard of care applicable to maintenance and repair work.

       As noted above, Plaintiff does not respond to these arguments at all. She merely cites

section 402A. But when directly asked at the hearing whether she was relying on a strict liability

theory, Plaintiff did not contradict Greenwood's statement that the only claims were for

negligence.

       Greenwood is entitled to summary judgment on Count 12. First, Greenwood did not

design or manufacture the aerial platform and is not responsible for any alleged design defects.

Second, there is no evidence in the record that Greenwood was negligent in conducting repairs or

maintenance on the truck. And, finally, the standard of care for maintaining and repairing a

complex piece of machinery like the apparatus at issue here is beyond common knowledge and

Plaintiff fails to provide any expert evidence establishing the appropriate standard of care or how

Greenwood allegedly breached it.

       E.       Wrongful Death Statute Claims

       As a final matter, Greenwood argues that summary judgment should enter in its favor on

Plaintiff's claims for violation of the Rhode Island wrongful death statute. Greenwood maintains

that summary judgment must enter on these claims because they are wholly derivative and

depend upon the success of Plaintiff's other claims. Although this court has granted Greenwood

summary judgment on the majority of Plaintiff's claims, Plaintiff still maintains her claim for

---

[132] Id. (quoting Scittarelli v. Providence Gas Co., 415 A.2d 1040, 1043 (R.I. 1980)).

breach of the implied warranty of merchantability. If Plaintiff is successful on this claim, there will be a predicate wrongful act for purposes of the wrongful death statute. Summary judgment is therefore denied as to Counts 13 and 14.

IV.    Conclusion

For the foregoing reasons, E-One's Motion for Summary Judgment [#111] is DENIED. Greenwood's Motion for Summary Judgment [#113] is ALLOWED IN PART and DENIED IN PART. It is allowed with respect to Counts 8, 10, 11, and 12. It is denied with respect to Counts 9, 13, and 14. Additionally, this court grants summary judgment in favor of E-One on Counts 1 and 3 because Plaintiff has failed to prove essential elements of those claims. Accordingly, the remaining claims in this case are Counts 2, 4, 5, 6, 7, 9, 13, and 14.

AN ORDER HAS ISSUED.

/s/ Joseph L. Tauro
United States District Judge